THE PEOPLE OF THE STATE OF NEW YORK ex rel. CORNELL UNIVERSITY v. IRA DAVENPORT, COMP-TROLLER OF THE STATE OF NEW YORK.

*Lands given by the act of congress of 1862 to the State to aid agricultural colleges — liability of the State to the United States — when such liability cannot be enforced against the State either by the comptroller or a person entitled to the income — purchase of bonds at a premium for a trust fund — rights of the tenant for life and remainderman — Act of Congress, chap. 130 of 1862 — Laws of New York, 1863, chap. 460 — 1865, chap. 585.*

By chapter 130 of 1862 congress gave to the several States certain public lands for the purpose of aiding colleges which should teach agriculture. The moneys derived from the sale of the lands were to constitute a perpetual fund, the capital of which was to remain forever undiminished and be invested in safe stocks, yielding not less than five per cent. It was further made a condition of the grant that if any portion of the fund invested, or any portion of the interest, should by any action or contingency be lost, it should be replaced by the State, so that the capital should remain undiminished and the annual interest should be regularly applied without diminution.

By chapter 460 of 1863 the legislature of this State accepted its share of the lands and authorized them to be sold and the proceeds invested in stocks of the United States or of this State, or in other safe stocks, yielding not less than five per cent. It declared that all the expenses of managing and disbursing the money should be paid by the State, so that the entire proceeds of the sale should be applied without any diminution whatever to the purposes mentioned in the act of congress, and that the capital of the fund should forever remain undiminished and be deposited in the State treasury. Chapter 585 of 1865 appropriated "the income, revenue and avails which shall be received from

the investment of the proceeds of the sale" to Cornell University for the aforesaid purposes.

Between October 1, 1882, and February, 1883, the comptroller purchased with moneys belonging to the said fund United States four per cent bonds of the par value of $200,000, payable in 1907, paying therefor $238,394.81, the sum of $38,394.81 being paid for accrued interest, premiums and commissions. He charged the sum of $200,000 to the principal and $38,394.81 to the income of the fund, thereby largely overdrawing the latter account. The University claiming to be entitled to five per cent on the principal of the fund held by the comptroller, whether the fund earned that amount or not, applied for a *mandamus* to compel the comptroller to pay over to it such five per cent after deducting the payments already made. The comptroller claimed that he should make no payments until the income account had made itself good.

*Held,* that whatever might be the effect of the agreement entered into between the United States and the State, and whatever liability the latter might have incurred to the former to provide for the payment of five per cent upon the principal fund received, such questions could not be considered upon this application; nor could either the comptroller or the University compel the State to fulfill any obligation it might have assumed.

That the University had no right or interest in the matter, except that conferred upon it by chapter 585 of 1865, viz., to receive the actual income of the fund.

That the actual income of the fund was the amount which it earned, remaining itself intact.

That the amount paid for the interest which had accrued on the securities purchased was properly charged to the income account.

That the amount paid for commissions should not have been charged to either account but should have been borne by the State.

That the amount paid for the premiums should not have been at once charged to the income account, but that from the annual interest received by the State upon its investment should be deducted such a sum as, if annually added to the par value of the securities, would at the maturity thereof represent a sum equal to the amount paid for such securities, and that the annual interest received by the State, after making such deduction therefrom, should be paid to the University.

That the residue of the interest received should be added to the principal so as to keep the amount of the original investment unimpaired.

APPEAL from an order made at a Special Term denying a motion for a writ of *mandamus.*

By chapter 130 of the Laws of 1862 the congress of the United States gave to the several States certain public lands for the purpose of aiding colleges which should teach agriculture, etc. The moneys derived from the sale of these lands or land scrip were to be invested in safe stocks, yielding not less than five per cent, were to constitute a perpetual fund, the capital of which was to remain for-

ever undiminished and the income to be applied as above stated. The assent of the several States to all the provisions of this act of congress was to be signified by legislative acts.

By chapter 460 of the Laws of 1863 the legislature of this State accepted its share of these lands. The act authorized the sale of the lands and the investment of the proceeds in stocks of the United States or of this State, or in other safe stocks, yielding not less than five per cent. It declared that all the expenses of management and disbursements of the moneys should be paid by the State, so that the entire proceeds of the sale of the lands should be applied, without any diminution whatever, to the purposes mentioned in the act of congress, and that the moneys invested should constitute a perpetual fund, the capital of which should forever remain undiminished (with an exception which is not material to the present case). It directed that the moneys received by the comptroller under this act should be deposited in the treasury as a trust fund.

By chapter 585, Laws of 1865, the legislature provided, in substance, that the income, revenues and avails should be paid to Cornell University for the purposes defined in the act of congress on certain conditions which it is unnecessary to mention. It is not disputed that Cornell University is the beneficiary of the fund under the laws now existing.

Before October 1, 1881, the principal of the fund had become settled and fixed at $473,407.87, and it is known as the college land scrip fund.

On the 1st day of October, 1881, the balance of revenue in the treasury was...................... $3,203 47
The income during the year ending September 30, 1882, was ...................................... 20,074 27

$23,277 74

Paid Cornell University............... $18,700 00
Paid premium on U. S. bonds purchased................. $718 61
Interest accrued............. 2 47

721 08

19,421 08

Balance of revenue in treasury, October 1, 1882 .... $3,856 66

| | |
|---|---|
| Balance of revenue October 10, 1882................. | $3 901 66 |
| Since that time there has been received as interest... | 7,280 76 |
| Total revenue to February 10, 1883............. | $11,182 42 |

On the 1st day of October, 1882, there was of the principal of the fund a sum uninvested of $262,309.12. On the second and tenth of that month the comptroller purchased $200,000 United States four per cent bonds, for which he paid $238,394.81 as follows:

| | | |
|---|---|---|
| Face of the bonds ............................. | | $200,000 00 |
| Interest accrued.................... | $131 51 | |
| Premiums....................... | 38,013 30 | |
| Commissions ............... ...... | 250 00 | |
| | | 38,394 81 |
| | | $238,394 81 |

Since that time the comptroller has also purchased $10,000 Albany county three and a-half per cent bonds for $10,316.66, as follows:

| | | |
|---|---|---|
| Face of the bonds ............................. | | $10,000 |
| Accrued interest .................... | $116 66 | |
| Premium ....................... | 200 00 | |
| | | 316 66 |
| | | $10,316 66 |

On making the aforesaid payment of $238,394.81 the comptroller charged $200,000 as paid from the principal fund, and charged $38,394.81 against the revenue account. In like manner, on paying the sum of $10,316.66 aforesaid, $10,000 was charged as paid from the principal, and $316.66 was charged against the revenue account. Thus on the 10th of February, 1883, the revenue account stood overdrawn $27,529.05, and the uninvested capital stock at $52,309.12.

Appropriations to Cornell University were made by the legislature, payable from the college land scrip fund revenue as follows: In 1881, $25,000, and in 1882, $25,000, on which the only payment made is that above mentioned of $18,700. The comptroller refuses to make any further payments, claiming that the income of the fund

must make good the amounts charged against it as above for interest, premiums and commissions.

It is admitted that the investments above mentioned were the best that could be made by the comptroller of the moneys, and that the same draw the most interest obtainable therefrom. The relator claims that it is entitled to five per cent on the principal, whether the fund earns that amount or not, and that it is entitled to as much more as the fund actually earns. The relator asked for a *mandamus* requiring the comptroller to draw his warrant for $28,640.29, being five per cent on the principal for two years, less $18,700, paid as aforesaid. The motion for a *mandamus* was denied and an appeal was taken to this court.

*S. D. Halliday*, for the relator.

*Leslie W. Russell*, attorney-general, for the comptroller.

Learned, P. J.:

In considering the duties of the comptroller we can look only to the statutes of this State. Whatever may be the terms of the act of congress; whether, or not, the State promised by its statute to comply with those terms; whether the statutes of the State are, or are not, a substantial compliance therewith; all these are questions with which we have nothing to do. The comptroller is an officer· of the State and must obey its laws. He cannot disobey them, on the ground that, by the contract with the United States, the State should have passed a different law. That is a matter between the United States and this State. Perhaps the statute of the State does not conform to the conditions of the grant. But whether it does, or not, we must be governed by it.

The first clause of section 5 of the act of congress declares, as a condition of the grant, that if any portion of the fund invested or any portion of the interest shall, by any action or contingency be diminished or lost, it shall be replaced by the State; so that the capital shall remain undiminished and the annual interest shall be regularly applied without diminution. Now, it is urged by the relator that that condition, accepted by the State, constructively imposes on the State an obligation to make good the interest at the rate of five per cent at all hazards. If this

be so, the question whether the comptroller should have charged premiums against the revenue account is of little consequence; since, on that theory, he is to pay the relator five per cent without any reference to his receipts.   But certainly the comptroller has no right to compel the State to perform this contract, which it is supposed to have made with the United States.   If such a contract was made by the act of 1863, it is for the legislature alone to carry it out, by providing for deficiencies of income.   The comptroller can only obey the laws already passed.

Further still, the relator stands in no position to insist on the benefit of the conditions contained in the act of congress.   The relator is a mere volunteer, to which the legislature, by chapter 585, Laws of 1865, appropriated " the income, revenue and avails which shall be received from the investment of the proceeds of the sale." The legislature did not, by that act, or by the provisions of chapter 511, Laws of 1863, agree with the beneficiary that the income should be five per cent on the principal.   It appropriated the income, such as it might be.   If the State had agreed with the United States that it would replace any deficiency of the interest, lost by action or contingency, it could appropriate the amount thus replaced to any college within the intention of the act of congress. What it appropriated to the relator was only the *actual* income. To give the construction claimed by the relator would be to carry the doctrine of *Lawrence* v. *Fox* to a more mischievous extent than has yet been done.   The legislature said to the relator we will give you the income which shall be received.   The relator now says to the comptroller, give me the income which has *not* been received; because the State promised the United States to replace any deficiency.

We think, then, that the relator is not entitled to require the comptroller to pay five per cent on the principal, without regard to the actual income.

Another question is presented; and that is, what is the actual income ?   The comptroller insists that the sums paid for premiums, commissions and accrued interest must be made good out of the earliest receipts of income; and that, not until these sums shall have been made good, will there be any income from which to pay the relator.   The relator insists that these sums are not chargeable

against income, but that they must be taken from the principal; thus imposing an obligation upon the State to replace the deficiency, which must arise therein.

And just at this point we may say what was in substance said above. The relator has no right to ask ·the comptroller to do any act which shall diminish the principal. Even if we were to assume that, whenever premiums are paid on the purchase of investments, the State ought to pay them, as it might pay expenses of taking care of the fund, still the State has not done this. And the comptroller has no right to do it. That is, he cannot treat the premiums as an expenditure, which the State ought to make good, and which he will, therefore, compel the State to make good, or else to leave the principal impaired.

The sums thus charged against the income, or revenue account, are of three kinds, viz., accrued interest, commissions and premiums.

*First.* Accrued interest. That is properly charged against the income account. It is the interest already earned by the security purchased, and the amount of it will be returned to the interest account when the purchased security makes its next payment of interest.

*Second.* Commissions.

The act of the State (chap. 460, Laws 1863, § 3) requires that all expenses in the management and disbursement of the moneys which shall be received from the sale of the land scrip, shall be paid out of any moneys in the treasury not otherwise appropriated; so that the entire proceeds without any diminution whatever shall be applied to the purposes mentioned in the act of congress. Commissions paid on the purchase of securities are expenses incurred in the management of the moneys. They are not chargeable to the income account, nor to the principal.

*Third.* Premiums. These present the most important and most difficult question. When the law of 1863 was passed it was evidently thought that a safe stock, yielding five per cent on the par value, could be purchased at par. Financial affairs have so changed that a four per cent stock of the United States is worth, and was worth at the time referred to in the present papers, more than nineteen per cent premium. It has become impossible to do what was contemplated by the act of congress and by the statute of this

State, viz., to invest the fund in safe stocks at par bearing five per cent interest.

As between the State and the United States we do not think that it was intended that the State should guaranty that the fund, safely invested, would forever produce five per cent. All that could have been intended was that the State should replace the loss of the fund, or of part of it, arising from inability to collect and like causes. And, so far as the present question is concerned, there is nothing in the statutes, which the relator can insist upon, as a guaranty to *it* that the fund shall be preserved inviolate.

The question for the relator is what, under the circumstances, is the actual income of the fund. The income from an investment is that which it earns, remaining itself intact. Now it is plain that, so far as the present question goes, it matters not whether the comptroller bought these United States stocks in the market, or bought them directly from the government itself. But the matter to be decided will appear more clear, if we consider the dealing to have been directly with the government. Viewed in that light the transaction was this: The comptroller loaned to the government (in round numbers) $238,000, receiving therefor its agreement to repay, in the year 1907, $200,000, and meantime to pay four per cent annually on the latter sum. This does not present the case of a loss, or accident, or failure to collect. It is a part of the bargain, that, in order to secure a greater amount annually, the lender consents to take less at the end of the loan. If the comptroller had lent to the government $238,000, to be repaid in full, he would have received rather less than three per cent; taking as authority for that statement the market price of stocks, and the income would have been (say) $7,100. Hence it may be seen that the whole of the $8,000 annually received on the four per cent stocks cannot justly be considered income.

It is a common matter with bankers and dealers in stocks to compute, by the aid of tables, what the actual income is, of a stock running a certain definite time, for which a certain premium is paid. That actual income is plainly less than the amount yearly received, because the premium paid must be so distributed, in the calculation, over the time the stock has to run, that the owner at the end of the time will have his original investment unimpaired.

Otherwise (though he may not notice this), he will have been gradually impairing his capital; in fact, using it up in the form of income.

To illustrate this, let us suppose a person is trustee for one for life with remainder absolutely to another. The trustee holds $120,000. If he invests in three per cent United States bonds at par, the tenant for life receives annually $3,600 and the remainder man will (except for unforseen calamities) have the estate unimpaired.

But if, in order to give the tenant for life a better income, the trustee invests in United States four per cents (say at 120) and pays all that is annually received to the tenant for life, then such tenant receives $4,000 annually, and the remainder man, supposing the tenant to live to the year 1907, gets but $100,000. (See *Farwell* v. *Tweddle*, 10 Abb. N. C., 94.) This would not be just. Nor on the other hand would it be just to stop all payment of income for five years, until the annual $4,000 had made up the premium of $200,000.

That the mode of charging adopted by the comptroller is not fair may be seen from this. In a year or two the revenue will have paid these premiums. And at that time these United States four per cent bonds, standing in the account of principal at $200,000, will still be worth nearly their present amount of $238,000. So that, at the expense of the income, the principal will then have been increased by about $38,000; an increase which, of course, will eventually be lost, when the bonds are paid off.

On the other hand, the rule above stated will maintain the principal and available revenues uniform. That rule is that so much only of the moneys received annually on these bonds shall be treated as income as, according to the computations and tables above mentioned, they are found to produce. (We do not attempt to make the calculation. It is probably about $7,100.) The residue belongs to the principal; and annually added thereto will make up for the gradual depreciation which must come, as the bonds approach maturity; and will keep the fund unimpaired when they are paid off.

It will be noticed that we have not been discussing the case of accidental losses, or of fluctuations in value; but only the case where a sum has been invested, upon an agreement to receive back a certain definite less sum, at a certain fixed time, and meantime a

certain annual payment. In that case we think that the whole of the annual payment cannot be treated as income; when a question arises between the principal fund on the one hand and the income on the other. The income, as above said, from an investment is that which it earns, remaining itself intact.

The view of the matter above stated will probably entitle the relator to a *mandamus* requiring the comptroller to pay a certain sum ascertainable by calculation. And that amount can be ascertained and fixed in the order.

Order denying *mandamus* reversed and *mandamus* granted according to above views. No costs.

Present — LEARNED, P. J., and BOOKES, J.; BOARDMAN, J., not acting.

Order reversed and *mandamus* granted according to the terms of the opinion.